**Jason FERRELL**

v.

**A.T. WALL, Warden of the Adult Correctional Institutions.**

No. 2005-54-Appeal.

Supreme Court of Rhode Island.

Dec. 27, 2005.

John A. MacFadyen, Esq., Providence, for Plaintiff.

Aaron L. Weisman, Providence, for Defendant.

Before WILLIAMS, C.J., FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

This appeal is the most recent proceeding following the brutal, gang-style murder of John Carpenter (Carpenter) on December 18, 1995. In 1997, the defendant, Jason Ferrell (defendant), was acquitted of first-degree murder, but convicted of conspiracy to commit first-degree murder, conspiracy to assault with intent to murder, and assault with intent to murder in connection with Carpenter's untimely death. His several convictions were affirmed by this Court in *State v. Oliveira*, 774 A.2d 893 (R.I.2001). The state now appeals an order of the Superior Court vacating the defendant's convictions upon a petition for post-conviction relief based on newly discovered evidence and the ineffectiveness of his trial counsel. The hearing justice concluded that an unsworn videotaped recantation by the primary witness against the defendant, Lorenzo Evans (Evans), coupled with evidence that the defendant's trial attorney negligently withheld potentially exculpatory alibi evidence, warranted vacating the defendant's convictions and sentence. For the reasons set forth herein, we reverse the order of the Superior Court and reinstate the defendant's convictions.

## I

### Facts and Travel

A detailed recitation of the facts surrounding Carpenter's murder and defendant's subsequent conviction in connection with that crime are reported in our 2001 opinion, *State v. Oliveira*, 774 A.2d 893 (R.I.2001). We repeat only those events necessary for the present appeal.

On December 18, 1995, shortly after 11 a.m., Evans was a passenger in Carpenter's blue Chevy Nova, which was traveling near the intersection of Dexter and Division Streets in Providence. At some point, the occupants of a black Jeep Cherokee opened fire on the blue Nova and gave chase. A mechanical malfunction caused the Nova to stall, and Evans and Carpenter abandoned the vehicle. Evans managed to escape over a fence; when he looked back to see how his comrade had fared, he watched two of the three Jeep occupants shoot Carpenter to death at close range.

Evans darted through the yards of nearby houses, trying in vain to get some assistance. According to Evans's testimony at defendant's trial, as he knocked on the door of one house, he made a precautionary glance out into the street and saw a parked, white Ford Taurus. The car had two occupants: defendant sat in the driver's seat, and Jermaine Campbell (Campbell) sat in the passenger's seat. Evans testified that defendant was holding a "chrome object" which resembled a handgun, and he moved it up and down.

Prior to Evans being taken to the local police station shortly after Carpenter's slaying, Evans insisted that the police had the wrong man and that they should be looking instead for "East cats" in a white Ford Taurus and a black Jeep Cherokee. Evans was detained as a suspect and questioned. He stated that he was unable to identify any of Carpenter's assailants. Evans was released from police custody, but returned the following day, December 19, 1995, to implicate Gahil Oliveira, Robert McKinney and Pedro Sanders as the gunmen in the black Jeep. He also identified defendant and Campbell as the occupants of the white Taurus. It was Evans's identifications and parallel trial testimony that would serve as the basis for defendant's indictment and subsequent conviction.

At trial, defendant sought to present a carefully crafted alibi defense through the testimony of three witnesses. This defense was premised primarily upon the testimony of Elizabeth Laposata, M.D., chief medical examiner for the State of Rhode Island, that Carpenter died at 11:27 a.m. First, Nicholas Discullio (Discullio) testified that he saw defendant at a gas station on the East Side of Providence at approximately 11:15 a.m., and that the two men spoke for about fifteen minutes. Second, Diane Baptista (Diane) testified that defendant arrived at the Baptista residence, located at 17 Evergreen Street in Providence, sometime between 10:40 and 10:50 a.m., and was still there when she returned from bringing her mother to dialysis at 11:45 a.m. These two witnesses were permitted to testify at defendant's trial without limitation.

Finally, Debra Baptista (Debra), mother of Wayne Baptista,[1] testified that defendant was at the 17 Evergreen Street residence from 10:45 a.m. to 11 a.m. the same morning of Carpenter's death. In fact, she was prepared to testify further that after defendant left her house, he returned sometime after 11:15 a.m., and remained there until approximately 11:35 a.m. During discovery, however, defense counsel failed to provide the state with any of Debra's anticipated testimony as to defendant's whereabouts after 11:15 a.m. After a voir dire of the witness, the trial justice ruled that "[t]his [was] a clear and unequivocal Rule 16 violation for which [defense counsel] [had] no explanation," and, thus, Debra was precluded from testifying about defendant's location after 11:15 a.m.[2]

The jury acquitted defendant of first-degree murder, but convicted him of con-

1. At defendant's trial, the state's theory of the case was that John Carpenter's murder was retribution for the killing, just days before Carpenter's death, of Wayne Baptista, a friend of defendant.

2. When defendant subsequently appealed his conviction to this Court, he raised, as one issue, the trial justice's finding that Debra Baptista (Debra) was precluded from testify-

ing about defendant's whereabouts after 11:15 a.m. This Court concluded that the trial justice did not abuse her discretion in finding that defense counsel had violated Rule 16 of the Superior Court Rules of Criminal Procedure, and thus affirmed her decision to limit Debra's testimony. *State v. Oliveira*, 774 A.2d 893, 908 (R.I.2001).

spiracy to commit first-degree murder, conspiracy to commit assault with intent to murder, and assault with intent to murder. One day before defendant's sentencing, however, on June 24, 1997, the lone eyewitness placing defendant near the scene of the crime, Evans, recanted his trial testimony in the offices of defendant's criminal defense attorney; this recantation was memorialized on videotape, was approximately four minutes long, was not given under oath, and, of course, was not subject to cross-examination by the state. The defendant chose not to come forward with this evidence at that time. On June 25, 1997, defendant was sentenced to an aggregate term of forty years imprisonment at the Adult Correctional Institutions (ACI).

The first time any court of this state was made aware of Evans's recantation was in February 2001. The defendant had appealed his conviction to this Court on January 13, 1999. On February 27, 2001, while his appeal was pending, defendant filed a *Motion to Remand Case for Consideration of Newly Discovered Evidence and Newly Available Evidence.* Submitted with this motion were the original videotape of Evans's unsworn recantation as well as several affidavits, reports and statements intended to buttress the trustworthiness of the videotape. The motion was denied on April 17, 2001, and this Court went on to affirm defendant's conviction on July 6, 2001. *State v. Oliveira,* 774 A.2d 893 (R.I.2001).

More than five years after the date of Evans's videotaped recantation, on July 3, 2002, defendant filed an application for post-conviction relief in the Superior Court, pursuant to G.L.1956 chapter 9.1 of title 10. He premised his application primarily upon two contentions: (1) that Evans's recantation constituted newly discovered evidence and required that his

convictions be vacated; and (2) that his trial counsel's Super. R.Crim. P. 16 blunder rendered defendant's representation constitutionally infirm in violation of the Sixth and Fourteenth Amendments to the United States Constitution, and article 1, section 10, of the Rhode Island Constitution.

At the evidentiary hearing on defendant's application, which occupied five days between December 18, 2003, and January 9, 2004, the state challenged the admissibility of Evans's recantation as hearsay, and the hearing justice deferred a definitive ruling on the state's objection until the court had heard whether Evans would testify and be available for cross-examination. When Evans took the stand, however, he invoked his Fifth Amendment privilege against self-incrimination on all questions asked him. Evans's counsel indicated that a potential prosecution for perjury was the chief concern prompting him to advise his client to invoke the Fifth Amendment. The state declined to seek immunity for Evans, despite the hearing justice's suggestion that a failure to grant immunity would result in his allowing the videotaped recantation as a full exhibit. Indicating that the state's refusal to grant immunity to Evans should not bar Evans's recantation from being admitted, the hearing justice admitted the videotape as a full exhibit upon defendant's renewed motion.

The defendant also presented two witnesses at the hearing. Matthew Smith, Esq. (Smith) was, at the time of Evans's recantation, serving as one of defendant's attorneys, and he had supervised the videotaping of Evans's recantation. Smith testified at the hearing that Evans was in no way coerced to recant. In addition, Campbell, defendant's companion on the day of Carpenter's murder, testified that neither he nor defendant was near the

area of Providence where Carpenter was slain at the time of his murder.

More than ten months after final memoranda were submitted, the hearing justice granted defendant's application for post-conviction relief in a written decision dated February 2, 2005, vacating defendant's several 1997 convictions. In his written decision, the hearing justice expressly found Evans to be credible in the videotaped recantation; he also found Campbell, the primary witness who testified on his behalf at the post-conviction relief hearing, to be credible. In addition, the hearing justice took notice of defense counsel's sworn statements, admitting negligence in his representation at defendant's trial. In vacating defendant's convictions, the hearing justice added that "[defendant] would [have been] entitled to post-conviction relief if all he had was the recanting; but the Rule 16 ineffectiveness claim buttresses his position. If all he had, however, was the Rule 16 claim, his claim might be weaker, and a more thorough analysis of all dimensions of his alibi defense would have been undertaken."

The state filed a timely appeal on February 3, 2005, pursuant to § 10–9.1–9. In addition, the state petitioned this Court for a stay pending the result of its appeal on February 10, 2005. This stay was granted on February 22, 2005, and it was thereafter extended until further order of this Court.

## II

### Analysis

On appeal, the state essentially advances two arguments. First, the state claims that the hearing justice committed reversible error by finding that Evans's videotaped recantation warranted vacating defendant's convictions. Second, the state maintains that the hearing justice erred by finding that defendant's ineffective assistance of counsel claim had merit. We address these contentions *seriatim.*

## A

### Evans's Recantation

First, the state points to several facts it claims so undermined the credibility of Evans's recantation that the hearing justice clearly erred in finding it trustworthy. Most significantly, the state argues that the hearing justice, without the benefit of Evans's testimony at the post-conviction relief hearing, simply lacked an adequate factual basis upon which he could properly adjudge as credible the videotaped recantation—made out of court and not under oath—over Evans's in-court testimony at defendant's criminal trial, which was subjected to searching cross-examination by both defendant and his codefendants. Second, the state maintains that Evans's videotaped recantation was inadmissible hearsay and, therefore, the hearing justice abused his discretion by allowing the recantation as substantive evidence.

### 1

### The Credibility of Evans's Recantation

"This Court will not disturb a trial justice's factual findings made on an application for post-conviction relief absent clear error or a showing that the trial justice overlooked or misconceived material evidence in arriving at those findings." *Young v. State,* 877 A.2d 625, 628 (R.I.2005) (quoting *Bustamante v. Wall,* 866 A.2d 516, 522 (R.I.2005)); *see also Hampton v. State,* 786 A.2d 375, 379 (R.I.2001). "Alleged constitutional violations, however, must be reviewed *de novo." Hampton,* 786 A.2d at 379; *see also Carillo v. State,* 773 A.2d 248, 252 (R.I.2001). Therefore, while we "afford great deference to findings of historical

fact by the hearing justice," *Hampton,* 786 A.2d at 379 (quoting *Carillo,* 773 A.2d at 252), we "review *de novo* any post-conviction relief decision involving questions of fact or mixed questions of law and fact pertaining to an alleged violation of an applicant's constitutional rights." *Young,* 877 A.2d at 628 (quoting *Busta-mante,* 866 A.2d at 522).

"[A]pplication[s] for postconviction relief [are] civil in nature." *Ouimette v. Moran,* 541 A.2d 855, 856 (R.I.1988); *see also* § 10–9.1–7 ("[a]ll rules and statutes applicable in civil proceedings shall apply"). The trial court applies a two-pronged test to determine whether to grant post-conviction relief based upon newly discovered evidence, *Fontaine v. State,* 602 A.2d 521, 524 (R.I.1992); *State v. Lanoue,* 117 R.I. 342, 346, 366 A.2d 1158, 1160 (1976); we have affirmed the use of this test when the purported new evidence is a recantation by a material witness. *See Fontaine,* 602 A.2d at 524. The first prong has four parts:

> " '[T]he evidence [must] be (1) newly discovered since trial, (2) not discoverable prior to trial with the exercise of due diligence, (3) not merely cumulative or impeaching but rather material to the issue upon which it is admissible, [and] (4) of the type which would probably change the verdict at trial.' " *State v. Luanglath,* 863 A.2d 631, 639 (R.I.2005); *see also Fontaine,* 602 A.2d at 524.

If this " 'threshold test' " is satisfied, the second prong requires that the trial justice "determine whether the evidence presented is credible enough to warrant relief, a determination made by his [or her] accepting or rejecting conflicting testimony by exercising his or her 'independent judgment.' " *Fontaine,* 602 A.2d at 524 (quoting *State v. Brown,* 528 A.2d 1098, 1104

(R.I.1987)); *see also Luanglath,* 863 A.2d at 639. It is this second prong upon which the state's argument is premised.

Courts properly view recanting affidavits and testimony with great suspicion. *See United States v. Ogle,* 425 F.3d 471, 478 (7th Cir.2005); *United States v. Adi,* 759 F.2d 404, 408 (5th Cir.1985); *United States v. DiCarlo,* 575 F.2d 952, 961 (1st Cir.1978) (noting the " 'considerable skepticism' * * * which attends recantation"); *People v. Schneider,* 25 P.3d 755, 763 (Colo.2001); *People v. Morgan,* 212 Ill.2d 148, 288 Ill.Dec. 166, 817 N.E.2d 524, 528 (2004); *Yarborough v. State,* 514 So.2d 1215, 1220 (Miss.1987); *see also Dobbert v. Wainwright,* 468 U.S. 1231, 1233–34, 105 S.Ct. 34, 82 L.Ed.2d 925 (1984) (mem.) (Brennan, J., dissenting) (denying a petition for writ of certiorari). Sworn recantations upset "society's interest in the finality of convictions," and are "very often unreliable and given for suspect motives * * *." *Dobbert,* 468 U.S. at 1233–34, 105 S.Ct. 34.

While all recantations are viewed with some degree of skepticism, unsworn recantations deserve increased suspicion. A sworn affidavit at least carries with it certain inherent indicia of reliability. "Our legal system treats with great seriousness a statement that has been sworn to before a notary public." *Scarborough v. Wright,* 871 A.2d 937, 939 n. 4 (R.I.2005). "Because [an] affidavit [is] sworn to before a notary public, the statements asserted therein [are] regarded as truthful and the document is therefore available as evidence of the facts stated." *In re Testa,* 489 A.2d 331, 335 (R.I.1985). It follows, therefore, that an unsworn, out-of-court recantation must be viewed with a markedly heightened mistrust.[3]

---

3. The defendant argues that this Court does not *per se* view sworn testimony as more

Undoubtedly, it is precisely this unreliability inherent in an unsworn recantation that has led other courts to conclude that recantations not made under oath or in court do not constitute adequate bases to support post-conviction relief. *E.g., United States v. Baxter,* 733 F.2d 1443, 1445–46 (11th Cir.1984); *Sims v. State,* 195 Ga.App. 631, 394 S.E.2d 422, 424 (1990). In affirming a lower court denial of post-conviction relief, the Superior Court of Pennsylvania has held that the trial justice's finding a recantation incredible "was reasonable, especially since the alleged recantation was not made either under oath at the hearing * * * or in an affidavit." *Commonwealth v. Fernandez,* 232 Pa.Super. 19, 332 A.2d 819, 821 (1974). And the Washington courts have concluded that an "unsworn out-of-court statement is not the equivalent of an in-court recantation, and that such a statement does not trigger the new trial requirements of [Washington case law], even where the testimony of the person making the statement was the sole basis for the defendant's conviction." *State v. Landon,* 69 Wash.App. 83, 848 P.2d 724, 729 (1993). This same court noted that other states agree with the Washington courts' practice of approving "the denial of a new trial when a witness has 'recanted' by means of an unsworn out-of-court statement." *Id.* (quoting *State v. Southerland,* 45 Wash.App. 885, 728 P.2d 1079 (1986), *aff'd in part,* 109 Wash.2d 389, 745 P.2d 33 (1987))

 Certainly the most compelling panacea for the questionable reliability of any witness statement is cross-examination. "Cross-examination has been described as the 'greatest legal engine ever invented for the discovery of truth.'" *State v. Brown,* 709 A.2d 465, 486 (R.I. 1998) (quoting 5 J. Wigmore, *Evidence* § 1367 at 32 (Chadbourn rev.1974)). Indeed, illustrative of this point is the procedural guarantee of the Sixth Amendment, which "commands * * * not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington,* 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *see also Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."); *Kentucky v. Stincer,* 482 U.S. 730, 737, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) ("The right to cross-examination * * * thus is essentially a 'functional' right designed to promote reliability in the truth-finding functions of a criminal trial."). Given the greatly increased skepticism with which a court must view an unsworn, out-of-court recan-

---

credible than unsworn testimony, citing *Fontaine v. State,* 602 A.2d 521 (R.I.1992). In *Fontaine,* in response to an applicant's implication "that because the recantations [were] under oath, they [were] more credible than the previous statements in which the complaining witnesses asserted that the applicant had criminally assaulted them," *id.* at 527, we stated that:

> "[t]his is part of the evidence involved in the credibility issue that the trial justice weighed in his determination. * * * The fact that the complaining witnesses did not

initially testify to the charges alleged in open court does not automatically discredit their original charges of criminal conduct perpetrated by the applicant." *Id.*

In this case, however, it was Evans's *original* testimony that was given in court and under oath, and his recantation which was unsworn. We think this is a critical difference; in light of the suspicion with which even *sworn* recantations are viewed, the fact that Evans's recantation neither was made under oath nor in court detracts in a palpable way from the statement's credibility.

tation, coupled with society's strong interest in the finality of convictions, assessments based upon "amorphous notions of 'reliability,'" or credibility, absent cross-examination, are intrinsically suspect. *See Crawford*, 541 U.S. at 61, 124 S.Ct. 1354.

Likewise, this Court has commented approvingly on the value of cross-examination when a recantation is presented as newly discovered evidence in a post-conviction relief proceeding. In remanding a post-conviction relief denial for an evidentiary hearing in *State v. Fontaine*, 559 A.2d 622 (R.I.1989), we instructed that:

> "At such an evidentiary hearing the trial justice may consider the proposed recanted accusation of the complaining witnesses and may assess the credibility thereof. The trial justice may further weigh the credibility of these statements in light of the defendant's admissions in open court or by affidavit of the factual basis for his plea. *We do not believe that this process may be carried out*

*without taking the testimony of witnesses at an evidentiary hearing." Id.* at 625 (emphasis added).

On appeal after remand, we affirmed the hearing justice's denial of the defendant's post-conviction relief application. *Fontaine*, 602 A.2d at 527–28. Significantly, we accorded the hearing justice's findings the deference owed them because he now had sufficient evidence before him to properly adjudge the credibility of the two recanting witnesses: namely, the firsthand observation of both recanting witnesses who testified under oath and under the pressure of cross-examination. *Id.* at 524–27.

The lack of opportunity to cross-examine a recanting witness at a post-conviction relief hearing has prompted other jurisdictions to hold that a defendant is not entitled to relief if the recanting witness invokes his or her Fifth Amendment privilege against self-incrimination.[4] The

4. The defendant appears to suggest that the state's failure to grant Evans transactional immunity to testify at the post-conviction relief hearing was the primary reason why Evans chose not to take the stand. The trial justice as well stated that the state's "strategic determination not to seek immunity for Mr. Evans" should not mean defendant cannot obtain post-conviction relief. We pause briefly to comment on the propriety of the state's decision to deny Evans immunity.

The law of immunity in Rhode Island is codified at G.L.1956 § 12–17–15, and is applicable only in criminal proceedings. Section 12–17–15 provides, in relevant part:

> "Whenever a witness, including a child as defined in § 14–1–3, refuses, on the basis of his or her privilege against self-incrimination, to answer a question or to produce other evidence of any kind *in a criminal proceeding* before any court or grand jury of this state, the attorney general may, in writing, request the presiding justice of the superior court or the chief judge of the family court or the district court to order the witness to answer the question or produce the evidence. The court, in its discretion, after

notice to the witness, may order the witness to answer the question or produce the evidence." (Emphasis added.)

We are not convinced that this statute is available at a civil proceeding like this post-conviction relief hearing. *See* G.L.1956 § 10–9.1–7 ("[a]ll rules and statutes applicable in civil proceedings shall apply").

Even if this Court were to hold that § 12–17–15 was available to the state in a post-conviction proceeding, this immunity would have been of no benefit to Evans in this case. Section 12–17–15 explains that an immunized witness cannot be subsequently prosecuted for any criminal activity he or she testifies to, or on the basis of any evidence uncovered as a result of that testimony. However, "he or she may be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing, or contempt committed in answering or failing to answer * * * in accordance with the order." *Id.* In *State v. Paquette*, 117 R.I. 638, 369 A.2d 1096 (1977), this Court determined that the state could *not* subsequently prosecute an immunized witness when his *prior* testimony was perjured: "The statute clearly confers full transactional immunity

federal courts are unanimous that if a "recanting witness claims his [or her] privilege against self-incrimination when he [or she] is put on the stand at the hearing on the motion for a new trial, the motion will be denied." 3 Charles Alan Wright, Nancy J. King, Susan R. Klein, *Federal Practice and Procedure: Criminal 3d* § 557.1 at 578–79 (2004); *accord United States v. Stewart*, 445 F.2d 897, 900 (8th Cir.1971) (recognizing "the fact of recantation by a witness is immaterial if the recanter refuses to testify, claiming his Fifth Amendment privilege against self-incrimination"); *see also United States v. Lawrenson*, 315 F.2d 612, 613 (4th Cir.1963); *Newman v. United States*, 238 F.2d 861, 862–63 (5th Cir.1956). Our sister states have expressed a similar weariness. *E.g., Dunbar v. State*, 555 P.2d 548, 551–52 (Alaska 1976) (holding that the trial justice did not err in finding that no credible evidence was adduced at the post-conviction hearing when the recanting witnesses invoked their Fifth Amendment privileges); *Callier v. Warden*, 111 Nev. 976, 901 P.2d 619, 628 (1995) ("The district court appropriately considered [the] witnesses' refusal to testify under oath and subject themselves to cross-examination in concluding that their recantations were not credible."). In fact, defendant can point this Court to no decision holding that post-conviction relief must be granted on the basis of an unsworn, out-of-court recantation in which the recanting witness refuses to testify at the hearing, opting instead to invoke his or her Fifth Amendment privilege against self-incrimination.[5]

and a witness who takes the stand under a grant of immunity conferred pursuant to § 12–17–15 and who *testifies truthfully* cannot be prosecuted regardless of prior inconsistent sworn statements." *Paquette*, 117 R.I. at 644, 369 A.2d at 1099 (emphasis added). *Paquette* makes clear, however, that the state is *not* barred from prosecuting an immunized witness who perjures himself through the precise testimony immunity was granted for: "However, we hasten to point out that one who perjures himself by answering untruthfully *at the trial* can be prosecuted, *immunity notwithstanding*." *Id.* (emphases added).

To the extent Evans was fearful of a potential perjury prosecution, a grant of immunity under § 12–17–15 would have given him no protection. In other words, with or without § 12–17–15 immunity, Evans could be prosecuted for testifying falsely at the post-conviction relief hearing. Therefore, we fail to see how the state's decision to deny Evans immunity in this case affected Evans's decision to invoke his Fifth Amendment privilege and not testify; there simply is no available mechanism by which Evans could have escaped prosecution under the laws of this state if he chose to perjure himself at the post-conviction relief hearing.

Furthermore, we think it inappropriate to insinuate that the state's refusal to seek immunity was to blame for Evans's not being subject to cross-examination. In *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), *overruled on other grounds, Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the United States Supreme Court commented on the role of the agency charged with criminal prosecution thus:

> "[The United States Attorney] may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."
> *Id.*

With this in mind, we think the state in this case neither struck "foul blows," nor employed "improper methods" in seeking to uphold the sanctity of a jury conviction, wrought from a lengthy and intricate trial. Instead, we think the state properly used "every legitimate means" available to it.

5. At oral argument on December 5, 2005, defendant pointed this Court to *United States v. Stewart*, 445 F.2d 897 (8th Cir.1971), as a decision supporting the grant of post-conviction relief when a recanting witness invokes his or her Fifth Amendment privilege at a

The defendant cites *State v. Waters*, 706 A.2d 1342 (R.I.1998) (mem.), and *State v. Garcia*, 743 A.2d 1038 (R.I.2000), as well as a plethora of out-of-state decisions, to support his argument that no one attendant circumstance to a recantation—that is, that it is either unsworn and/or out of court, or that the recanter invokes his or her Fifth Amendment privilege at a hearing—ever has been held dispositive of a recantation's credibility. Instead, he insists, the credibility determinations in all these cases were borne from careful consideration of the totality of facts. We do not disagree with defendant that the hearing justice's charge upon an application for post-conviction relief is to adjudge credibility based upon the totality of evidence presented. The defendant's argument, however, ignores the threshold requirement that a sustainable credibility determination is conditioned upon *competent* evidence, regardless of the necessity to view it in its entirety.

We hold that the hearing justice in this case was presented with insufficient evidence to properly determine the credibility of Evans's recantation. The statement was videotaped out of court, and was not given under oath. Evans could have cured these difficulties by testifying at defendant's post-conviction relief hearing; instead, he chose to plead the Fifth Amendment. Under the factual circumstances of this case, we hold the hearing justice committed clear error in finding this recantation credible, effectively disregarding Evans's sworn testimony at defendant's criminal trial, where his version of events was subjected to dogged cross-examination. The mere fact that Evans's recantation aligned with his initial report

to police that he could not identify Carpenter's killers is insufficient by itself to warrant crediting the videotaped statement by the hearing justice. Furthermore, because there was no finding that either the authenticating testimony of attorney Smith or the corroborating testimony of Campbell would, by themselves, have warranted post-conviction relief, the hearing justice's conclusion that they were credible witnesses is irrelevant to our decision.

Because we agree with the state on this point, we do not address its other factual arguments.

2

### Evans's Recantation as Inadmissible Hearsay

■ The state next argues that Evans's videotaped recantation was improperly admitted into evidence as substantive proof of defendant's innocence. As a general matter, "[t]he admissibility of evidence is a question addressed to the sound discretion of the trial justice and will not be disturbed on appeal absent a clear abuse of that discretion." *State v. Briggs*, 886 A.2d 735, 749–50 (R.I.2005) (quoting *State v. Lynch*, 854 A.2d 1022, 1031 (R.I. 2004)). The Rhode Island Rules of Evidence apply at a post-conviction relief hearing just as they would at any other civil proceeding in this state. *See* § 10–9.1–7. Rule 801(c) of the Rhode Island Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *See also State v. Grayhurst*, 852 A.2d 491, 505 (R.I. 2004). Some statements constitute non-

---

post-conviction relief hearing. In *Stewart*, 445 F.2d at 901, however, the Eighth Circuit Court of Appeals merely found that the circumstances attending the witness's recantation required further factual findings at an evidentiary hearing. The defendant's reliance on *Stewart* is misplaced.

hearsay, Rule 801(d)(1–2); but a hearsay statement is inadmissible unless it falls within a hearsay exception contained elsewhere within the Rules of Evidence. R.I. R. Evid. 803, 804.

There is no doubt that Evans's recantation constituted hearsay. It was an out-of-court statement offered to prove the truth of the matter asserted: that Evans did not see defendant at the scene and that his trial testimony was false. *See* Rule 801(c). Therefore, to be admissible, the statement either must have qualified as non-hearsay or fallen within some recognized hearsay exception.

■■■ Evans's videotaped recantation simply cannot qualify as non-hearsay under Rule 801. "Under Rule 801(d)(1)(A), a prior statement of a witness who testifies at the trial or hearing and is subject to cross-examination is *not hearsay* if the statement is inconsistent with the declarant's testimony." *State v. Jaiman,* 850 A.2d 984, 987–88 (R.I.2004). Evans invoked his Fifth Amendment privilege against self-incrimination at the hearing, meaning he neither testified nor was subject to cross-examination.

In addition, Evans's videotaped recantation falls within no recognized hearsay exception. At the post-conviction relief hearing, over the state's objection, defendant argued that Evans's videotaped recantation was admissible as a statement against his penal interest. Evans's attorney clarified that his client's reluctance to testify was based, at least in part, on the potential for a perjury prosecution.

■■■ According to Rule 804(b), a declarant must be unavailable before a party may use the provisions therein. Rule 804(b)(3) provides that "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is *not* admissible unless corroborat-

ing circumstances clearly indicate the trustworthiness of the statement." In other words, the hearing justice must have been satisfied that there existed satisfactory corroborating indicia of trustworthiness surrounding Evans's recantation to overcome the presumption in Rule 804(b)(3) that this evidence ordinarily is inadmissible.

In *State v. DeRoche,* 120 R.I. 523, 389 A.2d 1229 (1978), this Court discussed the parameters of our Rule 804(b)(3). There we cited *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), as support for the proposition that statements against interest are admissible only where the "particular statements under consideration bore substantial assurances of trustworthiness." *DeRoche,* 120 R.I. at 531, 389 A.2d at 1233. To ascertain whether the statement(s) in question are sufficiently trustworthy, the *Chambers* Court looked to three factors: first, to whom and how close in time to the crime the statement was made; second, whether the statement is corroborated by other evidence; and third, whether the statement is truly self-incriminatory. *Chambers,* 410 U.S. at 300–01, 93 S.Ct. 1038; *cf. Cabrera v. State,* 840 A.2d 1256, 1267 (Del. 2004) (approving the use of these factors when considering whether corroborating circumstances support the trustworthiness of a statement against interest).

Although Evans did secure his unavailability by invoking his Fifth Amendment privilege, *see* Rule 804(a)(1), his videotaped recantation clearly did not bear substantial indicia of trustworthiness sufficient to overcome the presumption of its inadmissibility. First, Evans's recantation was made on June 24, 1997, more than a year and a half after Evans witnessed Carpenter's murder. In addition, the videotaped recantation represented Evans's third different version of the events

surrounding Carpenter's death since the murder. Furthermore, there was no evidence apart from the testimony of a codefendant to suggest that the version of events as recited in Evans's recantation was any more plausible than the version the jury found credible in 1997—a version tested in more than 100 pages of cross-examination. Finally, Smith's testimony about the circumstances surrounding the making of the videotape has no bearing on the trustworthiness of the substantive claims made in Evans's recantation. Accordingly, we hold the trial justice abused his discretion by admitting Evans's recantation into evidence.

## B

### Ineffective Assistance of Counsel

The state's final argument is that, because defendant was not prejudiced by his counsel's Rule 16 error, the hearing justice committed clear error in concluding that it rose to a constitutional deprivation of representation.[6] The defendant counters that the hearing justice's finding was proper, given that Debra's precluded testimony, if allowed at trial, would have persuaded reasonable jurors to acquit defendant.

Before reaching the merits of the state's appeal on this point, we pause to consider the hearing justice's purported endorsement of defendant's ineffective assistance claim. The hearing justice made the following findings with respect to this point: (1) that defense counsel's admission of negligence was sufficient to prove conduct "well outside that expected of criminal defense practitioners;" and (2) that Debra's excluded testimony was critically important to defendant's case. We interpret

these findings as an attempt to comply with the requirements of this Court's ineffective assistance jurisprudence. However, because the hearing justice admits that, standing alone, defendant's ineffective assistance claim might not have been enough to warrant post-conviction relief, it is at best unclear whether the hearing justice even found defendant's trial representation to be lacking to a degree rendering it constitutionally deficient in accordance with our well-established jurisprudence. Instead, the hearing justice opted to curtail a more thorough analysis in light of what he perceived as an overwhelmingly strong basis for post-conviction relief with the purported recantation evidence: "If all [defendant] had was the Rule 16 claim, his claim might be weaker and a more thorough analysis of all dimensions of his alibi defense would have been undertaken." It was incumbent upon the hearing justice to do the spade work and undertake defendant's constitutional claim before passing on its propriety. He did not do so, and on appeal this Court can apply the appellate rule and conduct an independent examination of this brief record and reach our own conclusion. See *Lyons v. Rhode Island Public Employees Council 94*, 516 A.2d 1339, 1344 (R.I.1986); *Lebon v. B.L. & M. Bottling Co.*, 114 R.I. 750, 754, 339 A.2d 272, 274–75 (1975).

We have, for some time now, interpreted the guarantee of effective counsel under article 1, section 10, of the Rhode Island Constitution as coterminous with its federal parallel, contained in the Sixth and Fourteenth Amendments to the United States Constitution, and as interpreted by *Strickland v. Washington*, 466 U.S. 668,

---

6. In his application for post-conviction relief, defendant asserted an additional basis for his ineffective assistance of counsel claim, namely that his trial counsel failed to pursue a double jeopardy defense. The trial justice concluded that this claim was meritless, however, and defendant has chosen not to appeal the trial justice's decision on this point.

104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Young*, 877 A.2d at 629; *Bustamante*, 866 A.2d at 522; *Brennan v. Vose*, 764 A.2d 168, 171 (R.I.2001). In Rhode Island, "the benchmark issue is whether 'counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *Young*, 877 A.2d at 629 (quoting *Bustamante*, 866 A.2d at 522). To illuminate this inquiry, we employ the two-tiered *Strickland* standard.

"First, the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *see also Young*, 877 A.2d at 629. That is, "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *Brennan*, 764 A.2d at 171. In addition, this objective deficiency is adjudged with a view of the totality of the circumstances. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *Hampton*, 786 A.2d at 381.

"Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *Hampton*, 786 A.2d at 381. This requires that a defendant show "that counsel's errors were so serious that the applicant was deprived of a fair hearing." *Hampton*, 786 A.2d at 381; *see also Brennan*, 764 A.2d at 171. We previously have indicated that an ineffective assistance claim "will not be deemed viable 'unless the attorney's representation [was] so lacking that the [hearing] ha[d] become a farce and a mockery of justice * * *.' " *Hampton*, 786 A.2d at 381 (quoting *State v. Dunn*, 726 A.2d 1142, 1146 n. 4 (R.I.1999)). As the United States Supreme Court has elaborated,

"[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceed-

ing. * * * The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 693, 694, 104 S.Ct. 2052.

Whether the facts of this case satisfy the first *Strickland* prong is not before this Court; instead, the state argues that defendant simply suffered no prejudice by his trial counsel's error. We agree.

There was sufficient evidence presented at the defendant's trial to establish an alibi defense; the jury simply chose not to believe the defense witnesses. Specifically, Discullio's testimony that he saw the defendant at a gas station at 11:15 a.m., and that the two men spoke for about fifteen minutes, renders Debra's excluded testimony merely cumulative. Whatever conceivable effect Debra's testimony may have had on the outcome of the defendant's trial is insufficient to establish a colorable ineffective assistance claim. The defendant must prove there was a reasonable probability that, but for defense counsel's Rule 16 error, his trial would have ended in a more favorable outcome. In light of the fact that the defendant did, in fact, introduce equivalent alibi evidence at his trial, it is unlikely Debra's cumulative testimony would have been "sufficient to undermine confidence in the outcome" of the defendant's trial. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. We hold that the defendant did not suffer constitutionally significant prejudice as a result of Debra's excluded testimony; therefore, the defendant's ineffective assistance claim must fail. We note that alibi testimony is serious business that must be disclosed to the state in advance of trial. Super. R.Crim. P. 16(c). To suggest that a criminal defen-

dant later can seek to amend his or her answer in accordance with the state's evidence is improper. *See State v. Engram,* 479 A.2d 716, 717–19 (R.I.1984).

## Conclusion

For the foregoing reasons, the judgment of the Superior Court is hereby reversed, and the defendant's 1997 convictions are reinstated. The record shall be remanded to the Superior Court for entry of judgment not inconsistent with this decision.

Justice GOLDBERG did not participate.