DECISION
Before this Court is the application of Timothy J. Brunelle ("Brunelle" or "petitioner") for post-conviction relief. Brunelle contends that newly discovered evidence demands the vacation of his plea of guilty entered in 1995. Brunelle now seeks post-conviction relief pursuant to G.L. 1956 § 10-9.1-1.[1] The State of Rhode Island ("State") objects to the petitioner's application.
 I Facts and Travel
On November 15, 1995, Brunelle pled guilty to three counts of child molestation. The sole complainant and alleged victim of Brunelle's actions was Jane Doe, [2] a relative of petitioner. Brunelle was sentenced for twenty years, including five years to serve in prison.
Jane Doe now recants her accusations. In a hand-written letter dated September 6, 2004 mailed by Jane Doe to the petitioner, she recanted her accusations and repeatedly apologized to the petitioner. She has also submitted an affidavit to the Court in which she recants her accusations and unequivocally states Brunelle's innocence. In her affidavit, executed only a few *Page 2 
months shy of her twenty-ninth birthday, Jane Doe stated that she initially "alluded to the fact that I had been molested by my uncle Timothy Brunelle" during the course of mental health counseling in an effort to explain "why I was as I was." (Aff. of Jane Doe [hereinafter Doe Aff.] ¶ 5.) Her mental health counselor reported these allegations to law enforcement officials and she was subsequently questioned by Rhode Island State Police officers. In her affidavit, Jane Doe recounts:
 "At the time I was sixteen (16) years old. I felt the situation to be intimidating and feared that I would be in trouble if I went back on my story. Ironically, I also felt that I was suddenly more acceptable to my parents as a victim. People were solicitous of me and all of a sudden all of my problems were not my fault but the fault of someone else." Id. ¶ 7.
She adds that she attempted to reveal the falsity of her accusations prior to testifying before the grand jury considering her allegations against the petitioner. However, "[i]t was indicated to me that I was trying to repress the thoughts and that I should proceed forward to obtain closure." Id.
¶ 8. She stated that she ceased receiving counseling in 1995, but resumed in 2002 at a facility located in Massachusetts. The thrust of the counseling soon settled on the situation regarding Timothy Brunelle. "Although I was aware that he was out of prison, I was feeling extremely guilt[y] for what I had done," she explains. Id. ¶ 9. She initially conveyed her recantation to the Rhode Island Office of the Public Defender and the Office of the Attorney General. When she did not receive a response, she mailed the September 6, 2004 letter to the petitioner recanting her accusations and seeking his forgiveness. She emphatically states, "Mr. Timothy Brunelle never sexually assaulted me."Id. ¶ 11.
The petitioner has applied for post-conviction relief based on Jane Doe's recantation. The petitioner claims that this is newly discovered evidence for which post-conviction relief is required under § 10-9.1-1(a)(4). Brunelle avers that since his release from prison he has married, *Page 3 
avoided all criminal activity, and is currently employed. The State does not disagree. (Mem. of Timothy Brunelle 1.)
The State's objection turns on the credibility of the various individuals, especially Jane Doe, involved in this matter since the complaining witness' initial allegations. In its memorandum in response to the petitioner's application, the State argues that "[t]his case turns entirely on the question of whether the Court believes the complaining witness to be truthful now or to have been truthful in 1993-1994 when she told her family, her counselors, DCYF, the State Police, the Department of Attorney General and the Grand Jury about the abuse." (Mem. in Opposition to Application for Post-Conviction Relief [hereinafter State's Memo] 8.) Similarly, in its Answer to the Petition for Post-Conviction Relief "the State admits that there has been a recantation of allegations by the alleged victim of the case, . . ., but is without sufficient information to form an opinion as to the truth or falsity of the recantation. . . ." (Answer to Pet. for Post-Conviction Relief ¶ 4.)
On December 7, 2007, the Court heard testimony in this matter. The Court now proceeds to consider the petitioner's request and the State's objection.
 II Standard
Rhode Island's post conviction relief statute provides:
 "Any person who has been convicted of, or sentenced for, a crime . . . and who claims:. . . . That there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interests of justice;. . . . may institute . . . a proceeding under this chapter to secure relief." Section 10-9.1-1(a)(4).
The petitioner is correct in asserting that the recantation of accusations made by a complaining witness constitutes newly discovered evidence for purposes of post-conviction relief. See, e.g., *Page 4 State v. Perry, 667 A.2d 784, 785 (R.I. 1995) (considering the petitioner's application for post-conviction relief "based upon the victim's subsequent recanting of his original statements accusing defendant of sexual molestation); State v. Fontaine, 559 A.2d 622, 623
(R.I. 1989) (Fontaine I) (considering an application for post-conviction relief "on the basis of the alleged recantation of the charges against [petitioner] that had been brought against him by the two complaining witnesses").
To receive the relief requested, the petitioner must satisfy a two-pronged test established by the Rhode Island Supreme Court. The first prong of the test has four parts: a) the evidence must actually be newly discovered; b) the petitioner must have been diligent in attempting to discover this evidence for use at the original trial; c) the evidence must be material, rather than merely cumulative or impeaching; and d) the evidence "must be of the kind that would probably change the verdict at a new trial." Fontaine v. State, 602 A.2d 521, 524
(R.I. 1992) (Fontaine II).
Once this threshold test is satisfied "the trial justice must then determine whether the evidence presented is credible enough to warrant relief. . . ." Id. To make a credibility determination the trial justice must conduct an evidentiary hearing. Fontaine I, 559 A.2d at 622, 625;see Reise v. State, 913 A.2d 1052, 1056 (R.I. 2007) ("[O]rdinarily this latter [credibility] determination is, out of necessity, made in the context of an evidentiary hearing.").
 III Law and Analysis
In the matter presently before this Court, there is no question that the petitioner has satisfied the first prong of the two-pronged test. At the outset, the State does not contest the first prong. Rather, the State has repeatedly expressed that its objection is derived from its belief that victim's recantation is not credible. (Answer to Pet. for Post-Conviction Relief ¶ 4; State's Memo 8.) *Page 5 
Nonetheless, assuming arguendo, that the State did contest the first prong of the required analysis, the Court would still find that the petitioner has satisfied the threshold test. First, the victim's recantation was only discovered upon her disclosure to the petitioner in the letter dated September 6, 2004, and thus, newly discovered since the petitioner entered his plea. Fontaine II, 602 A.2d at 524; seeGenCorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 834 (6th Cir. 1999) ("To constitute `newly discovered evidence,' the evidence must have been previously unavailable."). Second, the facts clearly indicate that through no amount of diligence would Brunelle or his defense attorney have discovered that Jane Doe would later recant her accusations. State v. Carsetti, 111 R.I. 642, 306 A.2d 166, 171 (1973) ("The facts must indicate diligence on the part of a defendant to try to discover this evidence for use at the original trial."). Third, victim's accusation and recantation constitute testimony "which is relevant and goes to the substantial matters in dispute, or has a legitimate and effective influence or bearing on the decision of the case." U.S. v.Riggs, 495 F. Supp. 1085, 1090 (M.D. Fla. 1980). This testimony is "material evidence . . . that must be carefully considered in order to fairly decide the merits of a proposition." Torrey v. Congress SquareHotel Co., 75 A.2d 451, 456 (Me. 1950). As such, the recantation is clearly material, and certainly not cumulative, to Brunelle's underlying criminal charges. Ferrell v. Wall, 889 A.2d 177, 184 (R.I. 2005) (stating, "we have affirmed the use of this [two-pronged] test when the purported new evidence is a recantation by a material witness"). Lastly, Jane Doe's statement that the petitioner did not commit the crimes that she formerly alleged is the principal basis of the charges; thus, its impact "is so controlling upon a material issue that it would probably change the result, if another trial were had." Warren v. Martini,72 R.I. 36, 47 A.2d 854, 856 (1946). *Page 6 
Having met the threshold requirement to secure relief, the petitioner must also show that the newly discovered evidence is sufficiently credible to warrant relief. Fontaine II, 602 A.2d at 524. "[T]he trial justice may consider the proposed recanted accusation of the complaining witnesses and may assess the credibility thereof." Fontaine I,559 A.2d at 625. This Court recognizes that "[s]worn recantations upset `society's interest in the finality of convictions,' and are `very often unreliable and given for suspect motives.'" Ferrell, 889 A.2d at 184
(quoting Dobbert v. Wainwright, 468 U.S. 1231, 1233-34 (1984)). Though sworn recantations "are viewed with some degree of skepticism . . . [a] sworn affidavit at least carries with it certain inherent indicia of reliability." Ferrell, 889 A.2d at 184. As the Ferrell Court explained, "Our legal system treats with great seriousness a statement that has been sworn to before a notary public. Because [an] affidavit [is] sworn to before a notary public, the statements asserted therein [are] regarded as truthful and the document is therefore available as evidence of the facts stated." Id. (internal citations and quotations omitted) (alterations in original).
In determining the credibility of the evidence in this matter "the hearing justice's charge . . . is to adjudge credibility based upon the totality of evidence presented." Id. at 188. For example, inPerry, the Rhode Island Supreme Court did not disturb the trial justice's finding that the victim's recantation was not credible.667 A.2d at 785. In that case, the trial justice heard testimony from the victim, defendant, and the victim's mother, who was the defendant's ex-wife. Id. According to the Supreme Court, "[t]he testimony revealed that the victim was pressured by his stepmother, with whom he was living in Virginia, to send a letter to his mother indicating that it had been his grandfather and not defendant who molested him." Id. Such testimony, combined with the defendant's admission of guilt during sentencing, was sufficient to find the victim's recantation not credible. Id. *Page 7 
Accordingly, the Court must examine the evidence presented at the time of the petitioner's plea and during his post-conviction relief evidentiary hearing. As the State correctly asserts, the Court must consider the statements made by Jane Doe in 1993 and 1994 that led to Brunelle's conviction, as well as the statements she made in recent years recanting her earlier accusations. (State's Memo 8.) The Court must also consider that the petitioner admitted to having committed the crimes charged.
After reviewing the record and hearing testimony, the Court is convinced that Jane Doe's recantation is credible. She presented as an apologetic woman attempting to make amends for the actions of her troubled past. It appears that her initial accusations against Brunelle were motivated by a youthful desire to gain her family's acceptance. Once she began to receive sympathy from family and other adults in her life, she found it impossible to retract her accusations. Years later, as an adult, she sought care from a licensed psychotherapist, Regina McCaffery ("McCaffery"). In a sworn affidavit, McCaffery repeats this scenario, stating ". . . indicated that she found sympathy and attention for this claim of victimization, which motivated her to sustain the allegation." (Aff. of Regina McCaffery, Ph.D. [hereinafter McCaffery Aff.] ¶ 5.) In McCaffery's opinion, ". . . demonstrated a painful sense of guilt and shame as she made these disclosures." Id. ¶ 7.
In an unsworn letter to the petitioner, a sworn affidavit, and testimony before this Court, Jane Doe has steadfastly repeated the petitioner's innocence and her fabrication of the allegations against him during her youth. There is no indication that she has been coerced to recant. Indeed, it appears that her recantation was initially made in the strict confidence of psychotherapy on February 23, 2004. Almost seven months later, on September 6, 2004, she informed the petitioner of her willingness to publicly recant. The victim's recantation efforts appear to have *Page 8 
been initiated entirely by her. Unlike Perry, there is no indication that anyone urged or coerced her. 667 A.2d at 785. There is no evidence that she was even in contact with Brunelle until she mailed a letter to him admitting the falsity of her allegations. In addition, she voluntarily submitted sworn testimony to this Court and submitted to questioning by the State. In all ways, her recantation is credible.
Despite the credibility of Jane Doe's recantation, the Court must consider the fact that Brunelle admitted to the crimes while imprisoned and later pled guilty. There is no question that Brunelle admitted then what he now denies. It is the Court's duty to probe this contradiction in light of all the evidence presented, including Brunelle's explanation for his plea. In a sworn affidavit, Brunelle provides several explanations for his plea. First, he states that he "was in extreme fear for my personal safety" at the Adult Correctional Institute due to rumors of the severe fate suffered by individuals accused of child molestation. Second, he states that his mother advised him "to tell police what they wanted to hear." Third, he claims that members of the Rhode Island State Police "indicated that I could be released if I cooperated," claims which police officials deny. Fourth, he states that he was advised by his attorney that the plea offer "was the best I could get."[3] (Aff. of Timothy J. Brunelle [hereinafter Brunelle Aff.] ¶ 4, 5, 6, 8.)
The Court has carefully reviewed the record and finds that several statements made by the petitioner prior to entering a plea are particularly enlightening. On February 23, 1994, Daniel Brunelle, the victim's father and the petitioner's brother, placed a controlled telephone call to the petitioner from the headquarters of the Rhode Island State Police. (Taped Telephone Conversation Tr. [hereinafter Telephone Tr.] 1.) Though the transcript available to the Court does not indicate the duration of this telephone call, the Court notes that the transcript runs 52 *Page 9 
pages in length. The transcript reveals what can only be described as an emotionally grueling conversation between the petitioner and his brother. At all times during the course of this conversation the petitioner either maintained that he did not sexually molest Jane Doe, or that he had no recollection of doing so.
Based upon the Court's own careful reading of the transcript, the petitioner explicitly denied the allegations in at least twenty-one instances during this telephone call. In addition, in at least twenty-six instances during the telephone call the petitioner stated that he had no recollection of sexually molesting Jane Doe. The following exchange, occurring after Daniel Brunelle told the petitioner that the victim had alleged that the petitioner molested her in the home of Daniel and Timothy Brunelle's parents', is representative of the entire conversation:
 "DAN: Did you do this?
 TIM: No. Dan, no, no.
 DAN: Timmy, you need — if . . . going to be helped. . . . the first thing that has to happen with her recovery is you admitting and she admitting. Now, she's already admitted it and she's starting to do a little better, but this is not gonna go away. . . . You know this family is never going to come back together. . . .
 TIM: I know but I can't say I did — I don't remember ever doing anything like that. . . . Dan, I am telling you the truth. I don't —
 I don't — Dan, I couldn't have done that. I couldn't have done that. Dan, what more can I tell you? I don't —" Id. 12, 13.
The Court recognizes that the petitioner was placed under enormous pressure to admit to the allegations. The following colloquy is illustrative:
 "DAN: Are you saying it's possible that you did it? There's a big difference between someone absolutely knowing they didn't do it and someone thinking they didn't do, not remembering doing it, because you know, . . . — TIM: Uh-huh.
 DAN: — before she admitted this was saying that nothing happened to her and everybody knew she was trying to commit suicide and, you know, she started trying to commit suicide last December. She did one at home, she slit her wrist and then last *Page 10 
June, she slit her wrist again and then she tried to hang herself with a rope and a bag around her neck and tied it as tight as she could; and then, she tried to jump out of a speeding car; and then she ran away from the group home in the middle of a freezing night with no real shoes on, just clogs. And then, to make the worst matters worst, right before she was going to come home, she cut her wrist all up again. She's trying to kill herself because she thinks she's terrible for what happened between the two of you. She thinks she's awful. . . . I know about it now. How do I face the rest of the family? How do I face Paul and Roland and you and mom and dad? How can I go to Thanksgiving or Christmas or dinners; I have to believe my daughter and the doctors. Do you know what I'm saying? TIM: Uh-huh.
 DAN: Do you realize that if you can recall these events happening, you're going to get a lot of support from the family for going to counseling and, you know, it's very important to understand that, you know this is serious stuff and that people who become sexually abused like that, you know, go through their counselors. The counselors then have to refer to an investigator and, you know, unless you come around and cooperate and start admitting things that you do remember, then — . . . . Listen to me, hear me about [sic]. I mean, I've got — she's out of my custody now. She's in state custody. Did you know that?. . . . Do you know what the state will do?
 TIM: What?
 DAN: The state's going to contact the Prosecutor, I mean an investigator.
 TIM: Um-hum.
 DAN: The state is going to refer it to the police. Do you — you know, if we can talk about this as a family, if you can talk about this as far as being counseled — if you can talk about this, about your feelings about this as far as what you remember happening rather than just have . . . have to tell a police investigator. . . ." Id. 24-26
In spite of this exchange, the petitioner nonetheless maintained, "I don't remember anything.
That is the truth; that is the truth." Id. 27. Indeed, after his arrest, the petitioner continued to deny the allegations under questioning by a member of the State Police. Eric L. Croce ("Croce"), the State Police detective who interviewed the petitioner after his arrest on March 2, 1994, later wrote that "the accused was hesitant to implicate himself on the charges however at a *Page 11 
certain point during the interview the subject made a damaging statement that he was in fact responsible for abusing the victim. After further conversation the accused then took the posture that he did not abuse the victim." (Memorandum from Eric L. Croce, Detective, to Captain Francis R. Muzerall, Detective Commander 4 (Mar. 3, 1994)). Because the "damaging statement" alluded to by Detective Croce is not identified in the record, the Court cannot consider that component of the detective's characterization.
Had the petitioner continued to either deny the allegations against him or claim an inability to recollect having performed those actions, it is possible that a different outcome would have resulted. However, it is the Court's duty to examine what actually occurred and not to speculate as to what might have occurred had the petitioner responded differently than he in fact did. Having consistently denied the allegations through the date of his arrest, the record indicates that on March 3, 1994, the petitioner requested to speak with a police officer regarding the victim's allegations. That afternoon Croce met with the petitioner and conducted a taped interview in which the petitioner admitted to sexually assaulting Jane Doe. Importantly, the petitioner's admission consists entirely of providing affirmative responses to often detailed questions posed by Croce. For example, Croce asked
 "Can you elaborate on any details that you can remember? For example, the allegations that were made involved a situation — one particular, certain situation — where your niece was sleeping on a couch and you would wake her up, brought her into your bedroom and as a result you showed her a cassette tape and then you sexually had contact with her and you anally penetrated her. Is that true, and is there anything you'd like to add to that?" (Interview of Timothy J. Brunelle by Detective Eric L. Croce 2-3 (March 3, 1994)).
The petitioner responded: "Yes, sir, that's true." Id. at 3. Brunelle responded by providing detailed information only once. After Croce asked "How many times approximately, if you *Page 12 
remember, did that [touching] occurring?," Brunelle responded "Umm, three times." Id. Apparently, Croce was unconvinced by the veracity of Brunelle's answer because the following colloquy took place:
 "Q: It did happen three times? Could it have happened —
 A: I think so.
 Q: Okay. Could it — but at least one time that you remember?
 A: Yes, sir." Id.
Given this confession, the Court recognizes that Brunelle's attorney may have advised him that a jury would "very likely" find him guilty, as Brunelle suggests his attorney did. (Brunelle Aff. ¶ 8.)
Brunelle is no longer in prison. Indeed, he was released in 1999 and has been living in our community since then. He has married and maintained employment. In every way he seems to have put this matter behind him. Despite his success at rebuilding his life, Brunelle voluntarily petitioned this Court to vacate his conviction. The Court is mindful that the post-conviction relief process frequently reopens old wounds. To voluntarily submit to that, as Brunelle did by initiating this proceeding, he doubtlessly believed that he had more to gain than to lose. At this point in his life, having been released from prison and built a life of his own, Brunelle has nothing to gain from reliving this moment of his own and his family's past except to do the proverbial clearing of his name. Prior to Brunelle's petition for post-conviction relief, Jane Doe had already admitted her falsehood to her family. Brunelle, therefore, was not motivated by a desire to vindicate himself in the eyes of his family. His motivation could only have been to remove from his life the stigma of criminal conviction for child molestation. This Court, having reviewed the record and heard testimony from several witnesses, including Jane Doe and Brunelle, finds that Brunelle's conviction resulted from an unfortunate combination of youthful immaturity by Jane Doe and fear by Brunelle, rather than from actual guilt. *Page 13 
 Conclusion
After reviewing the record in its totality, the Court finds that the petitioner has presented new evidence which, in the interests of justice, requires the vacation of the petitioner's plea of guilty. Accordingly, the petitioner's application for post-conviction relief is granted. Counsel shall submit an appropriate order for entry.
[1] As the trial justice is no longer a member of the Rhode Island Superior Court, this Court considers the matter pursuant to Rhode Island Superior Court Rules of Practice 2.3(d)(4). The Court notes that this decision does not challenge the accuracy of the plea hearing; rather, this decision addresses evidence newly discovered since that hearing occurred.
[2] According to G.L. 1956 § 9-1-44, the name of a minor victim must be designated by a fictitious name.
[3] The Court notes that Brunelle was represented by a member of the Rhode Island Office of the Public Defender who is now deceased. Consequently, the Court does not have the luxury of consulting the defense attorney's recollection of events.