DECISION
Before this Court is Petitioner Derick Hazard's (Hazard or Petitioner) application for post-conviction relief. This Court will not engage in a lengthy explanation of the travel of the underlying criminal case as that has been carefully detailed by our high court. See State v. Hazard, 797 A.2d 448 (R.I. 2002). For purposes of this decision it is sufficient to summarize certain major developments in the case.
 Pertinent Travel of the Case
Within a few days of the July 18, 1996 murder of David Andrews, the Providence Police obtained a warrant for petitioner's arrest. After initially meeting with Attorney Vincent Oddo (Oddo) prior to his surrender, Hazard and his family soon thereafter retained him. Through Oddo, Hazard turned himself in on the outstanding murder warrant. Oddo continued to represent Hazard during his bail hearing at the conclusion of which Oddo was able to secure Hazard's release on bond.
Approximately two years later, Hazard went to trial on the murder charge.[1] The State's case was built almost exclusively around the eyewitness testimony of Andre "Bucky" Williams (Williams) who claimed that he was with his friend, David Andrews (Andrews), when Andrews was shot and killed. Despite a motion to exclude his identification of Hazard as one of the shooters, Williams was allowed to testify that he saw Hazard and Troy Lassiter fire guns at Andrews from a burgundy colored car which sped away after the shooting.
Following the jury trial at which Hazard continued to be represented by Oddo, a jury returned a verdict of guilty. Having been denied a new trial, Hazard was subsequently sentenced. Thereafter, he filed a timely appeal.
Claiming that newly discovered evidence would likely show him innocent of the murder, Hazard fired Oddo and through his current attorney, filed a second motion for new trial. At Hazard's request, the case was returned from our Supreme Court to restore jurisdiction on the trial judge to hear a second motion for new trial, this motion being based upon alleged newly discovered evidence.
The essence of the second motion for new trial was that witnesses, including a New Jersey State Police Officer, could show that Hazard and other family members had left Providence for Columbus, Ohio on the morning of July 18, 1996, the day of Andrews' murder. Accordingly, Hazard could not have been in Providence and able to participate in the killing of Andrews.
An extensive evidentiary hearing was held before the judge who presided over the trial. Testimony at the hearing included that of Kevin Vieldhouse (Vieldhouse), a New Jersey State Police Officer who had stopped a car on Interstate 80 on the morning of the Andrews murder. Testifying solely upon his official police records, including a written warning given to the driver of the vehicle he had stopped, Vieldhouse identified the driver of the vehicle to be Kyle Hazard (Kyle), brother of the Defendant (now Petitioner). Lacking any specific recollection of the stop, Vieldhouse could not identify the two other black males who he had noted in his report as occupants of the car.
Several other witnesses testified at the hearing for a new trial. One of these, Mustfa Muhammed Abdulah Ali (Ali), claimed that he was friendly with the deceased, Andrews. Ali testified that he never saw Andre "Bucky" Williams at the scene of the murder during the 30 to 45 minutes that Ali lingered there while police and emergency personnel responded to the shooting. Ali was clearly not believed by the trial judge, perhaps because of a videotape of the scene which had been recorded immediately after the shooting by a freelance photographer. The videotape, introduced into evidence by the photographer, clearly showed Williams meeting with the police at the scene. The videotape did not record the presence of Ali. Five additional alibi witnesses, friends or relatives of Hazard who were not called as trial witnesses, testified that Petitioner was in Ohio on the evening of July 18, 1996, the time of the shooting. Following the three-day evidentiary hearing at which the aforementioned witnesses and others testified, the trial judge denied the motion for new trial based upon what was claimed to be newly discovered evidence. The Defendant appealed that ruling as well as other trial issues. Our high court affirmed. State v. Hazard,supra.
 Introduction to the Instant Motion for Post-Conviction Relief
Following remand to this Court, Hazard filed the instant application for post-conviction relief (PCR), alleging that the performance of his attorney at trial, Oddo, fell below that minimum standard required by the Constitution. See Stricklandv. Washington, 466 U.S. 668 (1984).[2] After conducting an evidentiary hearing at which several witnesses including both the Petitioner and Oddo testified[3] and a careful review of applicable law, this Court is prepared to decide the very narrow question presented in this case: Has petitioner proved by a preponderance[4] of the evidence that: (1) his trial attorney's performance was "ineffective" in the constitutional sense and; (2) there is a reasonable probability that absent his counsel's deficiencies the trial result would have been different?
This case has received a great deal of media attention and widespread interest on the part of many Rhode Islanders. These interested persons are by and large unfamiliar with the laws and rules which provide all litigants with a fair venue for the resolution of criminal matters which are actionable in this Court. This decision will not speak to the correctness of the verdict which has been affirmed on appeal. Nor will this decision review the two motions for new trial which have been heard, denied, appealed and affirmed by our highest court. This Court is only permitted to decide whether at trial, Petitioner was deprived of effective assistance of counsel in the constitutional sense.[5]
 "In Rhode Island, the benchmark issue is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. . . . [Our high court] previously [has] indicated that an ineffective assistance claim will not be deemed viable unless the attorney's representation [was] so lacking that the [hearing] had become a farce and a mockery of justice. . . ." Ferrell v. Wall, 889 A.2d 177, 191 (R.I. 2005) (citations and inside quotations omitted.).
 Facts Developed at the Hearing
The Court's analysis in this post-conviction matter, like all similar petitions for relief, is fact intensive. At the hearing held in February 2006, the following four witnesses testified: Vincent J. Oddo, Esq., Petitioner Derick Hazard, Toni Hazard (formerly Toni Fontes), and Trenda Hazard. Toni Hazard (Toni) and Trenda Hazard (Trenda), petitioner's wife and mother, respectively, testified during the trial.
Petitioner first called his trial attorney, Vincent J. Oddo. Oddo is a lawyer of some twenty-five years experience, primarily in the criminal defense area. Although he had never tried a murder case alone prior to the Hazard matter, Oddo testified that he had substantial experience with capital offenses and had assisted another member of the bar with respect to murder trials.[6]
Oddo indicated that he met at least two times with the Petitioner before he was retained. Important in these earlier discussions was Petitioner's claim that he had several witnesses who could place him in Ohio before and after the murder. Oddo recalls that Hazard, as well as other family members, told him that they traveled to the State of Ohio in two cars. However, Oddo indicated that the Petitioner never gave him any specifics as to the route that they had taken and had indicated that the only stops made were for food and gasoline. Thereafter, Oddo met with several family members to further develop what he believed would be a successful alibi defense.
At some point, clearly unremembered by Attorney Oddo, Oddo learned that a car in which his client claimed to have been traveling was stopped by the police, later learned by Oddo to be in New Jersey. Oddo has indicated on various occasions that he first learned this either immediately prior to the trial, during the trial, or shortly after the trial concluded. Oddo explained that he did not seek a continuance of the trial once he learned of the alleged traffic stop because he was provided absolutely no details by anyone as to where the stop occurred. In fact, Oddo explained that he was surprised (and perhaps somewhat irritated) that he had been provided no details of the traffic stop for the two years that he had represented the Petitioner. He indicated that his client could not even relate to him in what state the traffic stop had occurred. Moreover, when Petitioner finally advised him of the traffic stop, Petitioner assured Oddo that the police had issued no written citation or warning. Contrary to the position he now takes, Petitioner's earlier failure to provide details of the stop may have been a deliberate attempt to dissuade Oddo from investigating the incident. Petitioner would have known from his family that a written citation/warning of some type had been given to his brother. What Petitioner did not know was what, if any, information the officer had retained regarding the other two occupants of the vehicle.
Oddo testified that he continued to represent Hazard through a motion for new trial and the sentencing. New counsel did not appear in the case until after a number of articles had appeared in The Providence Journal in November 1998 — some of which were arguably highly critical of Oddo's trial performance.
During his post-conviction relief hearing testimony, Oddo indicated that at some point he asked his client about the stop, where it occurred, and when it occurred. However, his client failed to provide him with details. During the bail hearing, none of the witnesses who were called at Petitioner's request mentioned anything about a traffic stop by the New Jersey State Police. Regardless, using alibi witnesses, Oddo was successful in securing the release of Hazard following the bail hearing.
Oddo maintains that he was never told anything about the traffic stop until at or during the trial some two years later and that he did not learn that the traffic stop occurred in the State of New Jersey until he had read that fact in a ProvidenceJournal article which appeared in November 1998. On cross-examination, the State developed that the Petitioner had never told Oddo that he was driving the car to Ohio. Nor did Trenda Hazard or Kyle Hazard ever tell Oddo that Petitioner was driving the car which was ultimately stopped by New Jersey State Trooper Vieldhouse.
Petitioner Hazard was the second witness to testify at the post-conviction relief hearing. Hazard testified that he first learned that an arrest warrant for murder had been issued for him during a telephone conversation with his then girlfriend (now wife), Toni Fortes. Thereafter, he made plans to return to Providence around July 23, subsequently met with Attorney Oddo, and finally surrendered himself to the police on the outstanding warrant. For the reasons explained below, this Court did not find him to be credible.
Hazard explained that his mother, his girlfriend, Toni, and his cousin, Dennis Marrow,[7] accompanied him to Oddo's office on the first occasion. Hazard testified that he told Oddo that he could not have been involved in the murder because he was in Ohio at the time. Thereafter, he indicated that the group discussed the various alibi witnesses that could be called. Of particular import is Petitioner's claim that he went over the details of his trip to Ohio with Oddo, including the time that he left Providence and the route that they traveled. The Petitioner explained that he arose at about 7:30 in the morning, gassed up the car that they were to use, waited while a second car with relatives arrived and then proceeded as a tandem pair to Interstate 95. Petitioner further testified that he explained to Oddo that once they were over the George Washington Bridge, they got "pulled over." Because Petitioner claimed that they received no ticket or warning from the police officer who had given them a break, Oddo told Petitioner that there was nothing they could do with the traffic stop evidence. When the Petitioner inquired of Oddo as to whether or not they could employ an investigator to look into the traffic stop issue, Oddo allegedly indicated that if there was no ticket, there was no need to investigate.
Petitioner testified that at some point before the bail hearing he discussed with Oddo that he was driving the car which had been stopped. Petitioner further testified that the car which he was driving had been leased by Toni Fortes and that just shortly after crossing the George Washington Bridge — perhaps within one mile — he was pulled over while driving.[8] The trooper approached the car at which time Petitioner indicated that his license had been suspended. Petitioner then gave the trooper his brother's license and showed the officer the rental agreement for the car in which they were riding. Petitioner was insistent that the officer never gave them a written warning. He was equally insistent that he talked with his attorney about the traffic stop several times before the trial.
Of significance to this Court are the facts that: (1) Petitioner allegedly directed his brother not to mention the fact that Petitioner was driving at the time of the traffic stop;[9] (2) no witness called on behalf of Petitioner at either the bail hearing or trial mentioned the traffic stop in New Jersey; and (3) Petitioner admits that he never told TheJournal reporter investigating his alibi that he was the driver of the car that was stopped until a reporter advised him that warnings issued by the New Jersey State Police were destroyed after thirty days and that the warning issued on the date in question could not be located.
Also of import in evaluating the credibility of Petitioner is a tape recording introduced into evidence which reflected a November 14, 1998 telephone conversation between the Petitioner[10] and John Osmond (Osmond), an apparently well-intended citizen who believes in Hazard's innocence. Prior to that conversation, it is obvious that Osmond was told that Petitioner was driving the car at the time of the traffic stop. Subsequent to that revelation, it was learned by Hazard and Osmond (as reported in the November 12, 1998 edition of TheProvidence Journal) that the warning which had been issued to Kyle Hazard on the morning of July 18, 1996, had been recovered. In response to questioning by Osmond, the Petitioner indicated that had he known the warning still existed and reflected that Kyle was the driver, he would have told Osmond that Kyle was the driver, not himself.
There is another reason why Petitioner's testimony rings hollow. Petitioner claimed that the reason he told his brother Kyle to testify that Kyle was the driver and not Petitioner, was that Petitioner was concerned about how the court would use the disclosure that he was driving on a suspended license. However, petitioner candidly admitted that he drove about the streets of Providence during the summer of 1996 and was frequently stopped by the Providence Police even though they knew he was driving on a suspended license. This latter fact strongly suggests Hazard had no real concern that the authorities would consider his driving without a valid license significant regarding the issue of bail. Petitioner's testimony was not credible.
Toni Hazard was the last witness called on behalf of the petitioner. Although they did not live together in 1996, Toni (then Fortes) was Petitioner's girlfriend and has two children with him. Toni testified that she stayed overnight at Trenda Hazard's home with the Petitioner on the evening of July 17-18, 1996. She had rented a motor vehicle with her father's assistance, expecting that she would accompany the Petitioner and others for a vacation trip to Ohio. However, Toni testified that between 2:00 and 5:00 A.M. on July 18th, she left the house where she had slept when her child became ill because she knew the group, including Petitioner and Trenda, were traveling to Ohio that day. Toni testified that she left the keys for the rental car on a table and — so as not to disturb anyone in the household including the father of her sick child — she took a cab home. It seems somewhat odd that a man who treated Toni and her children as his "family" would just leave them behind, not even giving his sick child and the mother of this children a ride home in the wee hours of the night.
Toni testified that she did not see any of the Hazard family actually get into the cars which they reportedly used to travel to Ohio on July 18th. Toni also testified that she did not see the Petitioner on the following day but did speak with him over the telephone.[11]
Within a few days, Toni heard a television news announcement that Hazard was wanted for the murder of David Andrews. She subsequently spoke with him by telephone advising him of the news story and met with him in Providence as early as July 20th. When Petitioner returned to Providence, Toni accompanied him, Trenda, and a cousin for a meeting with Attorney Oddo at his office. The possible retainer of Attorney Oddo was at the recommendation of a mutual friend, Michael "T-bone" Franks. During this first meeting with Oddo, the group talked about the trip to Ohio and Oddo indicated that he wanted receipts for items purchased during the trip. Contrary to the testimony of her husband, Toni initially testified that it was not until near the beginning of the trial that the motor vehicle stop was first mentioned.
Toni indicated that Oddo was asked specifically about the need for an investigator. Allegedly, Oddo's response was that if it was important, an investigator would be obtained. Curiously, Toni indicated that Oddo never asked her for details of the stop. But even though she had not taken the trip with Petitioner and other members of his family, she attempted to figure out where the stop had occurred using a map. Toni recalled sitting with Oddo while the Petitioner indicated such things as: the "gentlemen (trooper) was tall"; he could "remember stopping to eat in Philadelphia"; and that he gassed up the car in the morning just before the group left.
Significantly, Petitioner did not testify that he attempted to figure out where it was that the traffic stop occurred through the utilization of a map. As discussed below, this is probably because he was held after trial before any map was used.
During his hearing testimony on September 13, 1999, Trooper Vieldhouse marked on Exhibit B the exact location where he stopped the car containing Kyle Hazard and two other black males. Significantly, the location is on Interstate 80 to the west of Interstate 95 (the New Jersey Turnpike). This Court finds it highly unlikely that the car would proceed a few miles further west on Interstate 80 and then radically divert to a different highway so that it would be possible for the Petitioner to have eaten in Philadelphia — over 50 miles to the south. Travelers on Interstate 80 west bound come nowhere near the City of Philadelphia.
Moreover, Toni's testimony had internal inconsistencies. While at the beginning of her testimony, she indicated that the traffic stop was not mentioned to Oddo until just before the trial, her testimony changed when, just before cross-examination began, she indicated that the traffic stop may have been mentioned to Oddo at or just before the bail hearing. Simply put, the testimony of Toni Hazard lacked credibility.
Also significant to this Court's fact-finding task is that while released on bail awaiting trial, Petitioner traveled to Ohio in January 1997. This trip was to attend the funeral of a close friend, Michael "T-bone" Franks, the man who had recommended Oddo to Hazard in the first instance. Toni testified that on this "second" trip to Ohio, Petitioner and she drove down Interstate 95 to "Route 81" west, going through several states, such as Connecticut, New York, New Jersey and Pennsylvania. On this trip, they had absolutely no discussion of the pending murder trial or Petitioner's previous trip through these states, not even where the car stop occurred. Toni Hazard indicated that she was the sole driver on the trip to Ohio. She and the petitioner were accompanied by the mother of the deceased, as well as Trenda Hazard.
Finally, through cross-examination, another major conflict was developed in Toni's testimony. With regard to the trip to Ohio to attend the Franks' funeral, Toni first testified that she drove on the return trip accompanied by Petitioner, Trenda Hazard, and one other young lady. However, shortly thereafter she changed her testimony, indicating that the Petitioner was not with her during the drive back to Ohio. On one issue Toni was totally consistent. At no time during the January 1997 trip did she, or to her knowledge anyone else, attempt to locate the area of the traffic stop which had occurred the summer before. This Court finds this testimony ludicrous considering that Toni testified about her extensive use of a map in an attempt to decipher the location of the July 1996 traffic stop.
Trenda Hazard was the last witness called at the PCR the hearing. Trenda testified that she was in one of the two cars that traveled from Providence to Ohio starting on the morning of July 18, 1996. The cars traveled in tandem and her son, the Petitioner, was in the other vehicle. Although she admitted that she testified at both the bail hearing and the trial, Trenda could not explain why she never mentioned the traffic stop during her earlier testimony even though stops for food and gas were discussed. The following testimony by Trenda Hazard during the bail hearing — held just weeks after the murder — is most telling:
"Question: Did you make any other stops.
 Answer: Gas. I was sleepy. No other stops. I am sure of that."
(Bail hearing, p. 73.)
In sum, contrary to the testimony of Petitioner's family and friends since the articles concerning the stop appeared in TheProvidence Journal beginning in November 1998, there is absolutely no mention of the traffic stop in any of the testimony given by those witnesses who testified for Petitioner during either the bail hearing or at trial.
 Legal Analysis
Pursuant to G.L. 1956 § 10-9.1-1 et seq. a defendant is permitted to file an application for post-conviction relief under circumstances where he asserts that his conviction was secured in violation of the state or federal constitutions. Here Petitioner claims that he was deprived of effective assistance of counsel because: (1) his retained trial attorney failed to investigate the traffic stop in New Jersey that occurred on the morning of the murder, and (2) failed to call witnesses who, similar to several who did testify at trial, could provide him with an alibi that he was in Ohio at the time of the murder.
From the outset of these proceedings, the State has argued that it is an exceedingly rare occurrence that a retained attorney has been found to be ineffective in the constitutional sense. Although there is validity to the State's assertion, petitioner's claim is not without precedent in Rhode Island. See Heath v.Vose, 747 A.2d 475, 479 (R.I. 2000) (holding that multiple pre-trial, trial and post trial errors reflected representation by retained counsel "so grossly lacking and deficient" as to require reversal).
In Young v. State, 877 A.2d 625, 629 (R.I. 2005), our high court again succinctly defined the parameters of the focused task now before this Court.
 "In reviewing a claim for ineffective assistance of counsel, we have stated that the benchmark issue is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. When reviewing claims of ineffective assistance of counsel, this Court has adopted the standard enunciated in Stickland v. Washington, 466 U.S. 668 (1984). The Strickland test requires a defendant to show (1) that counsel's performance was deficient, to the point that the errors were so serious that trial counsel did not function at the level guaranteed by the Sixth Amendment; and (2) that such deficient performance was so prejudicial to the defense and the errors were so serious as to amount to a deprivation of the applicant's right to a fair trial. Unless a defendant makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable." (Citations and inside quotations substantially omitted.)
 The Petitioner's Claims[12]
The First Prong of Strickland
This Court first considers petitioner's many claims in support of his assertion that his retained attorney's performance was so lacking as to deprive him of counsel as guaranteed by the Sixth Amendment.
One such claim is that the eye-witness testimony of Andre "Bucky" Williams should not have been believed by the jury. Petitioner argues that other witnesses made Williams' testimony highly suspect. One of these witnesses, Rene King (King), testified at trial that she saw David Andrews near West Clifford Street not long before he was shot. She said that she never saw Williams that evening. This testimony was in direct conflict with that given by Williams and, of course, similar to that of Mustafa Ali (Ali), a witness who waited over two years before making known his purported eye-witness account of the murder scene. As detailed above, Ali testified at the motion for new trial based upon newly discovered evidence that he was near the murder scene at the time of the shooting and remained there for 30-45 minutes thereafter. According to Ali, at no time did he see Williams, the State's only eye-witness to the murder. The testimony of both Ali and King was discredited by the videotape recorded by free lance photographer Ira Nasberg. That videotape contains several segments which show the presence of Williams at the scene of the murder. As corroborated by the trial testimony of Police Officer Cassidy, it was Williams who flagged him down and asked that immediate assistance be administered to his friend who had been shot.
This continuing attack on the credibility of Williams is of little moment to this PCR matter. The jury made credibility findings after hearing all of the trial evidence, including testimony by Williams and King. Nor is it alleged that Oddo was ineffective with respect to his cross-examination of Williams. Moreover, this Court finds that trial testimony from Ali would have been highly detrimental to Petitioner. Ali's credibility was soundly impeached by the videotape. Furthermore, it is clear that Oddo cannot be faulted for not calling Ali as a witness in that Ali's identity as someone allegedly at the murder scene[13]
was not disclosed until long after Oddo was discharged as Petitioner's attorney.
A second claim in support of a finding of ineffective assistance relates to Petitioner's assertion that Oddo failed to call a sufficient number of alibi witnesses at trial. Oddo called six alibi witnesses to show that Petitioner was in Ohio at the time of Andrews' murder. Those witnesses were Toni Fortes (now Petitioner's wife), Trenda Hazard (the Petitioner's mother), Kyle Hazard (the Petitioner's brother), Charlene Brunner (a close friend of Trenda who lives in Ohio), Victoria Perry (the sister of Charlene Brunner), and David Lane (another Ohio resident who was friendly with the extended Hazard family). Other witnesses from Ohio: John Dean, Edward E. Stewart, and Conchita Brunner were available but were not called by Oddo at trial. Nor was Temple Stevens, a Providence woman who depended on Trenda Hazard for babysitting during weekdays.
It is difficult to conclude that more alibi witnesses — similar to those called at trial — would have resulted in a different verdict. In fact, Oddo may have well believed that in employing an alibi defense, he needed to avoid the appearance of "overkill." Petitioner himself has acknowledged that alibi defenses are not always a sound trial tactic.[14] While some of the potential alibi witnesses who were not called at trial were not family members and, therefore, might be more readily accepted as unbiased, all had strong ties to the extended Hazard family.
Oddo was more than wise not to call some of these potential trial witnesses. For example, Temple Stevens testified at the motion for new trial hearing that she arrived at the home of Trenda Hazard at around 7:00 A.M. on July 18, 1996 to drop off her baby. (July 18, 1996 was a Thursday.) According to her testimony, it was then that she first learned of the trip to Ohio which had obviously been planned for some time. Temple indicated that she was disappointed not to have been asked to go along. Although it is not expressly established by the evidence, it appears that she may have left her child in Trenda's care who in turn took the baby to Ohio for several days. Clearly, this is not alibi evidence that is easily believed.[15] Moreover, if one alibi witness is disbelieved, counsel could reasonably believe that the entire alibi defense would be jeopardized. Nor should it be forgotten that the alibi defense that Oddo employed at the bail hearing was a success.
The centerpiece of Petitioner's PCR motion is the claim that his attorney failed to investigate the New Jersey traffic stop. His contention is that Oddo knew sufficient information about the stop to cause a timely investigation to be undertaken. Such an investigation, he asserts, would have discovered a totally unbiased, alibi witness, Trooper Vieldhouse whose testimony would have tipped the scales in favor of acquittal.
Petitioner posits that: (1) several witnesses could have testified at trial concerning the stop; (2) some of these witnesses would identify Petitioner as the driver stopped for a minor traffic infraction; (3) Vieldhouse could establish that the car, rented by Toni Fontes, was stopped while heading westbound on I 80, hours before the murder; and (4) Vieldhouse would corroborate that there were three black males in the car he stopped. However, there are several problems with this new-found evidence.
Of course, first this Court must determine whether there is credible evidence that Oddo knew sufficient facts about the traffic stop to conduct a timely investigation. Although Oddo testified that he could not remember exactly when he learned about the traffic stop (just before the trial, during the trial or after the trial), he consistently denied knowing any details — even the state in which the stop occurred — until after he was fired. There is apparently no notation in the case file kept by Oddo that can be used to document the date on which he first learned of a stop. However, Petitioner's testimony and that of his family are less than convincing as to their claim that Oddo knew about the stop in time to conduct a meaningful investigation, or at least ask for a continuance of the trial.
Given the totality of the facts and circumstances developed at trial and the three evidentiary hearings held in this matter,[16] there is substantial circumstantial evidence to support Oddo's testimony as to when he first learned that there was a traffic stop in New Jersey. Both Kyle Hazard and Trenda Hazard testified at the bail hearing in 1996, providing Petitioner with an alibi. The thrust of the alibi testimony was that on the morning of July 18, 1996, Derick, Kyle, and a cousin in one car and Trenda and two others in a second car, left Providence at about 7:00 A.M. heading for Columbus, Ohio. Trenda testified that the cars traveled in tandem and they made no
stops along the way except for food and fuel, arriving in Columbus before the Andrews killing.
Kyle Hazard testified that Petitioner never drove and stayed in the back seat. Neither Kyle nor Trenda ever mentioned a traffic stop at either the bail hearing or the trial. Nor did Petitioner mention to Oddo during those evidentiary presentations that Kyle had provided false testimony about who had driven the car. This Court finds the Petitioner's testimony regarding the traffic stop unworthy of belief. Kyle of course lied (or at least purposefully deceived the finders of fact) at both the bail hearing and trial, failing to even mention that there was such a stop. And in direct contradiction to Vieldhouse, Petitioner has testified that he was driving and neither he nor his brother received a written warning.
There was no known record about a traffic stop — independent of the testimony of the Petitioner and various family members — until Petitioner mentioned it to a reporter after his trial. The reporter subsequently wrote a story concerning the revelation inThe Providence Journal. When initially contacted by the reporter who indicated an interest in doing a story about the trial, Petitioner told the reporter that there had been a traffic stop in New Jersey which, had Oddo investigated it, provided additional alibi evidence. The reporter contacted the New Jersey State Police and was apparently told that records of traffic stops were routinely destroyed. Thus, there would be no record of the stop. It appears that it was only then that Petitioner told the reporter that: he was the driver; he had told the trooper that his license was suspended; he had provided the trooper with Kyle Hazard's valid license; and, he was given a verbal warning with the wish for a "safe trip."
Of course, it was subsequently learned that the New Jersey State Police had kept a record of the July 18, 1996 stop during which Trooper Vieldhouse gave Kyle Hazard a written warning. As Petitioner explained to his supporter, John Osmond, if he had known that there was a warning which named Kyle as the driver, he would have "switched it around and said my brother was driving." Of course, Petitioner still maintains that he was driving and admits to encouraging Kyle to testify falsely that he, not Petitioner, drove to Ohio. This Court accepts the testimony and records of the State Police as accurate and finds that Kyle Hazard — not Petitioner — was the driver.
Important to certain findings of this Court is the conflict between Oddo and Hazard family members regarding discussions about the location of the stop. Petitioner and Toni Hazard provided substantial testimony concerning their attempts with Oddo to ascertain where the traffic stop occurred. At one point — a point apparently not agreed to by Oddo — Toni and Petitioner allegedly used a map at Oddo's office while attempting to locate the site.[17] But Toni's testimony on this point rang hollow. During her PCR hearing testimony, she testified that she used Petitioner's recollection of the July 1996 trip to Ohio in an attempt to trace his route. She recalled one session where Petitioner recalled, among other things, "stopping to eat in Philadelphia." The traffic stop was on Interstate 80 to the west of the New Jersey Turnpike which is designated Interstate 95. Interstate 80 westbound proceeds almost due west into Pennsylvania, never coming closer than about fifty air miles to Philadelphia. This Court finds that members of the Hazard family, who traveled to Ohio in July 1996, did not eat in or near Philadelphia. Moreover, although a map have been used post trial when the fact of the traffic stop was first revealed to Oddo, it does not seem reasonable that a map was periodically employed to find the locale of the stop for over two years as Petitioner and Toni Hazard now assert.
Even more telling as to the credibility of Petitioner, Toni, and Trenda was the testimony concerning a trip taken to Ohio while Petitioner was free on bond while awaiting trial. In 1997, Michael "T-bone" Franks, an Ohio native, was murdered in Rhode Island. Franks was a close friend of both Petitioner and Toni, and was the man who had recommended that Petitioner hire Oddo as his defense counsel. Many of the Hazard family members, including the Petitioner, Toni and Trenda, traveled to Ohio in order to attend burial services for Franks. Even though the route taken in January 1997 was presumably the same route that had been taken in July 1996,[18] there was no effort made on this second trip to Ohio to pinpoint the location of the traffic stop.[19]
Moreover, Toni testified that at least one of the sessions with the map included a John Osmond who is affiliated with a group known as the Committee Against Wrongful Convictions. This is the John Osmond with whom Petitioner had the aforementioned taped conversation. Petitioner has conceded, and independently this Court finds, that this meeting occurred after the jury found Petitioner guilty. Thus, it is more logical to this Court that the use of any map came far too late to assist Attorney Oddo in his trial defense of the Petitioner.
On the evidence presented, this Court finds that Oddo could have reasonably exercised his judgment by not calling additional alibi witnesses. Based upon the totality of the evidence, this Court finds that Oddo was not advised of a traffic stop in sufficient detail to either investigate the stop prior to trial or to in good faith request a continuance of the trial. Although this case points out the danger to attorneys in failing to maintain reasonably complete notes of interviews and other significant case preparation, this Court finds that Attorney Oddo's recollection of the events surrounding his knowledge of the traffic stop is more credible and accordingly, more reliable that those accounts given by Toni Hazard, Trenda Hazard and the Petitioner. Oddo did not abdicate his attorney responsibilities as Petitioner asserts. (Petitioner's Memorandum of Law, at 13). Rather, this Court finds that Petitioner and his family purposely failed to timely disclose details of the traffic stop.
The Second Prong of Strickland
Even if Oddo had been told sufficient facts which would have prompted an investigation into the traffic stop by a reasonable and competent attorney, Hazard must satisfy the second prong of the Strickland test. "[T]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Farrell, 889 A.2d at 191 (quotingStrickland, 466 U.S. at 694).
This Court has found the testimony of the Petitioner, his mother, Trenda Hazard, and his wife, Toni Hazard lacking in credibility regarding: (1) when they told Attorney Oddo about a traffic stop, and (2) when, if ever, any details of the stop were thereafter revealed to Oddo. A likely reason for such delayed disclosures is that the Petitioner was not in the car at the time of the stop. This Court finds that a written warning was given to Kyle Hazard, the driver at the time of the stop and that the Hazard family had no idea what independent recollection of the event Vieldhouse might have, or what if any record of the stop had been retained by the New Jersey State Police. Accordingly, not knowing exactly what information would be revealed by the police if an inquiry was made and records had been retained, a conscious decision was made not to disclose the occurrence of the traffic stop or at least any details of its location.
Even if evidence of the car stop had been uncovered by an investigation by Oddo, this Court finds that the car stop evidence would not have reasonably changed the result of the trial. First, the defense would have to weather scrutiny of the prior bail hearing testimony of Kyle and Trenda to the effect that there had been no stops along the way to Ohio other than for food and fuel. Likewise, Oddo was saddled with Kyle's testimony that Petitioner rode in the back seat for the entirety of the trip to Ohio. Officer Vieldhouse would have placed only one of the vehicles allegedly traveling to Ohio in New Jersey on the morning of the Andrews murder, not the two which some Hazard family members have claimed were traveling in tandem. Vieldhouse would identify Kyle as the driver of the vehicle which had been rented by Toni Fontes (now Hazard). Fontes was clearly not in the car and Vieldhouse could not testify that the Petitioner was one of the black males who were accompanying Kyle Hazard.
Thus, although Vieldhouse could place the rental car in New Jersey heading in the direction of Ohio at about 10:30 on the morning of July 18, 1996, his testimony would have been a fertile springboard for the prosecution to make the following points:
1. Vieldhouse could not put Petitioner in the rented car.
2. Toni Fontes, the lessee and common law wife of Petitioner, was not in the car.
3. Fontes did not travel to Ohio but rather stayed home because of a sick child who had been fathered by Petitioner.
4. Do these facts not strongly suggest that Petitioner would have stayed behind with his girlfriend and children?
Obviously, the testimony from Vieldhouse would be that of a disinterested witness and less susceptible to impeachment. This Court finds that he is and would be highly credible. On balance, however, this Court finds that the evidence which could have been admitted through Vieldhouse would not have reasonably benefited the Petitioner. Nor would the trial result been different if both Vieldhouse and additional alibi witnesses been produced by Attorney Oddo.
This Court finds that Petitioner has failed to show that there is a reasonable probability that, but for Oddo's unprofessional errors, the result at trial would have been different. Under the totality of the circumstances, therefore, he has failed to meet his burden with respect to the second prong of the Strickland
test.
Contrary to the ineffective attorney in Heath v. Vose,747 A.2d 475 (R.I. 2000), Attorney Oddo has substantial experience in capital cases. He was obviously effective in securing the Petitioner's release after a bail hearing at which he called several alibi witnesses. His success in doing so reasonably led to his decision at trial to mount an alibi defense with a limited number of proven witnesses. Nor was Oddo inattentive. Oddo met with Petitioner and his family on almost countless occasions. He pursued a motion to suppress identification evidence. He was active in the cross-examination of the prosecution's trial witnesses. He mounted an alibi defense. And he continued to represent the Petitioner after the verdict by filing a motion for new trial. Such efforts are not at all indicative of "representation so lacking that the [trial became] a farce and a mockery of justice." Farrell, 889 A.2d at 191.
Petitioner's application must be and is hereby denied.
[1] Petitioner was actually charged with three offenses: murder, conspiracy to commit murder and assault with intent to commit murder.
[2] While not specifically urging a parallel claim under the Rhode Island Constitution, petitioner has acknowledged that the analysis would be the same. See Bustamante v. Wall,866 A.2d 516, 522 (R.I. 2005).
[3] By agreement the record in this proceeding has been expanded far beyond the testimony and exhibits present at the PCR hearing. The testimony at the bail hearing, the murder trial testimony, the testimony given at the hearing on the second motion for new trial and the exhibits produced and admitted full during the hearing testimony of Officer Vieldhouse all constitute parts of the record in this post-conviction relief matter.
[4] Simpson v. State, 769 A.2d 1257, 1264 (R.I. 2001) (noting preponderance standard of proof).
[5] In performing the analysis, this Court is required to indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance. Strickland,466 U.S. at 689. See also Brown v. Moran, 534 A.2d 180, 182-83 (R.I. 1987).
[6] See footnote 12, infra.
[7] Dennis Marrow was allegedly one of the three black males who Trooper Vieldhouse noted were occupants of the car which he stopped on the morning of July 18, 1996. Marrow never testified in any of these related proceedings.
[8] Obviously, if this testimony was accurate, there would have been no need for Toni Fontes to have spent time with a map, trying to determine where the stop occurred. See infra at 10-12.
[9] At trial, Kyle testified that Derick remained in the rear set of the vehicle for the entire trip.
[10] Petitioner had been remanded to the Adult Correctional Institutions after verdict.
[11] Of interest to the Court was Toni's admission that she saw Troy Lassiter on the day of the Andrews murder. Lassiter was charged with and later pled guilty to committing the murder with Hazard.
[12] Petitioner has apparently abandoned his earlier claim that he relied upon Oddo's alleged false representation that he had prior experience trying murder cases. From the evidence adduced at the PCR hearing, it appears that Oddo was retained prior to his making representations about his experience defending murder and other capital crime cases.
[13] The videotape did not show an image of Ali.
[14] See Petitioner's Memorandum of Law at 20, note 13.
[15] Temple Stevens did not testify at the hearing on this PCR motion. However, the parties stipulated that the Court could consider all of the testimony given at all proceedings related to this PCR motion. It could be that if asked to explain further, Temple would have testified that she kept the baby home rather than have the baby transported to Ohio and back. This Court looks askant at Temple's testimony that she did not know in advance about the lengthy trip to be taken by the woman who was her every day babysitter. Thus, her entire testimony is of questionable veracity.
[16] This includes the bail hearing, the motion for a new trial, and this PCR matter hearing.
[17] Petitioner has never claimed to have used a map.
[18] There is no evidence to the contrary.
[19] Petitioner argues that his total failure to personally investigate the location of the traffic stop despite retracing the route six months later is of no relevance to this PCR action. He asserts that it is his attorney's actions or failures to act that are at issue. While it is true that this case centers on Oddo's performance as an attorney, this Court draws an inference adverse to Petitioner from his failure to even attempt to pinpoint the traffic stop scene while driving to and from Ohio in January 1997. Obviously, one can not recognize that which he has never previously seen.